**1 9MAG 7273**        ORIGINAL

Approved: _____
                STEPHANIE LAKE
                Assistant United States Attorney

Before:    THE HONORABLE DEBRA FREEMAN
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**

        - v. -                    :      Violation of
                                         18 U.S.C. § 2261A
VICTOR DELGADO,                   :

                Defendant.        :      COUNTY OF OFFENSE:
                                         NEW YORK
- - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JOHN KENNY, being duly sworn, deposes and says that he
is a Task Force Officer with the Federal Bureau of Investigation
("FBI"), and charges as follows:

**COUNT ONE**
(Stalking)

        1.     From in or about December 2018 through in or about
July 2019, in the Southern District of New York and elsewhere,
VICTOR DELGADO, the defendant, with the intent to kill, injure,
harass, intimidate, and place under surveillance with intent to
kill, injure, harass, and intimidate another person, used the
mail, any interactive computer service and electronic
communication service and electronic communication system of
interstate commerce, and any other facility of interstate and
foreign commerce to engage in a course of conduct that placed
that person in reasonable fear of the death of and serious
bodily injury to that person and caused, attempted to cause, and
would be reasonably expected to cause substantial emotional
distress to that person, to wit, DELGADO sent at least 12
threatening letters to various recipients with a particular

1

individual ("Victim-1") listed as the letters' sender, which caused Victim-1 substantial emotional distress.

(Title 18, United States Code, Section 2261A(2).)

2. I am a Task Force Officer with the Joint Terrorism Task Force (the "JTTF") of the FBI. I have been assigned to the JTTF since September 2017. I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with other law enforcement officers and agents, my interviews of witnesses, and my examination of documents, reports and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

3. As set forth below, from in or about 2013 until his termination in or about 2014, VICTOR DELGADO, the defendant, was the resident superintendent at a particular apartment building in Manhattan (the "Apartment Building"). *See infra* ¶ 7(b). The Apartment Building houses graduate students and faculty at a particular New York City university (the "University"). *See id.* A particular management company (the "Management Company") manages the Apartment Building and employed Delgado. *See infra* ¶ 7(a)-(b).

4. In or about 2013, an Apartment Building resident ("Victim-1") complained about DELGADO to the University. *See infra* ¶ 8(b). DELGADO subsequently began to harass Victim-1, ultimately leading to DELGADO's termination. *See infra* ¶¶ 7(c), 8(c). After the Management Company terminated DELGADO, DELGADO repeatedly called 911 to report false emergencies at Victim-1's address. *See infra* ¶ 8(d). As a result, in or about 2017 DELGADO was prosecuted by the Manhattan District Attorney's Office (the "Manhattan D.A.'s Office") and Victim-1 received an order of protection against DELGADO. *See infra* ¶ 8(e)-(f).

5. Between in or about December 2018 and July 2019, VICTOR DELGADO, the defendant, mailed at least 18 letters containing white powder and/or threatening messages (the

2

"Letters") to various Management Company and University
employees, to Victim-1, and to the Manhattan D.A.'s Office. *See
infra* ¶¶ 9-11. Twelve of the 18 Letters contained Victim-1's
name and/or address as the return addressee. *See infra* ¶ 9(a)-
(f).

6.    VICTOR DELGADO, the defendant, sent six of the Letters
in or about July 2019 (the "July Letters"). *See infra* ¶¶ 9(e)-
(f). DELGADO shipped the July Letters in a package sent from
Las Vegas, Nevada to an individual living in Manhattan (the
"Intermediary"). *See infra* ¶ 11. DELGADO asked the
Intermediary to remove the July Letters from the package and
mail them from Manhattan upon receipt. *See infra* ¶ 12. The
Intermediary received and mailed the July Letters on or about
July 11, 2019. *See infra* ¶ 12. The addressees, which included
Victim-1, received the July Letters on or about July 15 and 16,
2019. *See infra* ¶¶ 9(e)-(f).

### The Management Company and Victim-1

7.    Based on my conversations with an employee of the
Management Company ("Witness-1") as well as my review of law
enforcement reports, I have learned, among other things, the
following:

        a.    Witness-1 works at the Management Company. Among
other things, the Management Company manages residential
buildings in New York City.

        b.    In or about June 2011, the Management Company
hired VICTOR DELGADO, the defendant, to work as a resident
superintendent at the Apartment Building, which the Management
Company manages. The Apartment Building is located in Manhattan
and houses graduate students and faculty affiliated with the
University.

        c.    In or about September 2014, Witness-1 terminated
DELGADO from his position as the superintendent of the Apartment
Building. Witness-1 had received numerous complaints about
DELGADO's behavior from Apartment Building residents.

8.    Based on my conversations with Victim-1, my review of
reports of interviews of Victim-1, and my conversations with
other law enforcement officers who have interviewed Victim-1, I
have learned, among other things, the following:

3

a.      Victim-1 currently lives in the Apartment
Building and lived at the Apartment Building in or about 2013.

b.      In or about 2013, a student at the University
(the "Student") who lived in the Apartment Building complained
to Victim-1's spouse about DELGADO's behavior.  Victim-1 and
Victim-1's spouse raised the Student's allegations against
DELGADO with the University.

c.      After Victim-1 raised the allegations with the
University, DELGADO began acting out against Victim-1.  For
example, in or about late 2013 or early 2014, Management Company
employees observed DELGADO on video surveillance removing mail
from Victim-1's mailbox and throwing the mail in the garbage.
After viewing the video surveillance of this incident, the
Management Company fired DELGADO as the superintendent of the
Apartment Building.

d.      In or about 2014, after the Management Company
fired DELGADO, DELGADO began to harass Victim-1 by, among other
things, repeatedly calling 911 to report fake emergencies at
Victim-1's apartment.  For example, based on my conversations
with Victim-1 and my review of documents from the Manhattan
D.A.'s Office, I have learned the following:

i.      On or about November 4, 2014, DELGADO called
911 to falsely report a gas leak at Victim-1's address, causing
the New York City Fire Department ("FDNY") to respond to Victim-
1's home.

ii.     On or about November 26, 2014, DELGADO
called 911 to falsely report a domestic violence incident at
Victim-1's address, causing the New York City Police Department
("NYPD") to respond to Victim-1's home.

iii.    On or about December 2, 2014, DELGADO called
911 to falsely report animal abuse at Victim-1's address,
causing the NYPD to respond to Victim-1's home.

iv.     On or about December 8, 2014, DELGADO called
911 to falsely report smoke coming from Victim-1's address,
causing the FDNY to respond to Victim-1's home.

4

v.      On or about April 17, 2015, Witness-1 received a letter that Witness-1 believed DELGADO sent (the "April 2015 Letter"). Witness-1's assessment was based on, among other things, reference to the author's "unjustified termination" and references to some of the 911 calls DELGADO had placed falsely reporting incidents at Victim-1's apartment. Among other things, DELGADO wrote in the April 2015 Letter: "The war and the fight is just beginning. You caused a lot of problems in my life at my age. I am going to cause you problems. I hope [Victim-1] likes surprises, for I have a surprise for him."

e.      Based on my review of court records and conversations with individuals at the Manhattan D.A.'s Office, I know that on or about June 2, 2017, the Manhattan D.A.'s Office secured convictions against DELGADO for falsely reporting an incident, in violation of New York Penal Law Sections 240.55 and 240.50, in connection with each of the incidents referenced above in paragraph 7(d)(i)-(iv).

f.      As a result of DELGADO's harassment of Victim-1, Victim-1 obtained an order of protection against DELGADO in or about June 2, 2017, which expires on or about June 1, 2025.

## The Threatening Letters

9.      Based on my conversations with other law enforcement officers and recipients of the Letters, as well as my review of some of the Letters, I have learned, among other things, the following:

a.      On or about December 18 and 19, 2018, three Management Company employees and one University employee received letters in the mail which identified Victim-1 as the sender. Three of the four letters contained white powder,[1] and all of the letters contained what appeared to be a photocopy of the same hand-written note stating, "Im not moving out of my

---

[1] The white powder contained in each of the Letters referenced herein was tested for the following biological threats: Yersinia pestis, Francisella tularensis, Burkholderia mallei/ pseudomallei, Bacillus anthracis, and ricin toxin. All results were negative.

apartment. Over my dead body."[2]  The message contained in one of the letters a Management Company employee received is depicted below.



        b.    On or about June 20, 2019, two Management Company employees received letters in the mail which identified Victim-1 as the sender.  The letters contained white powder and a typed note stating, "I am not leaving my apartment over my dead body."

        c.    On or about June 24, 2019, another Management Company employee received a letter in the mail which identified Victim-1 as the sender.  The letter contained white powder and what appeared to be a photocopy of a handwritten note stating, "Im not moving out of my apartment. Over my dead body."

        d.    On or about June 24, 2019, Victim-1 received a letter in the mail, which letter identified Witness-1 as the sender.  The letter contained white powder but no note.

---

[2] The envelope containing one the four letters had fingerprints sufficient for analysis.  Based on my review of laboratory reports, I know that the fingerprints were analyzed and were not a match to VICTOR DELGADO, the defendant.  Based on my training and experience, I know that mail carriers, the letter's recipient, and possibly others are likely to have touched the envelope and may therefore have left their fingerprints. Moreover, I know that those who mail threatening letters often are careful not to leave their own fingerprints on the mail materials.

e.      On or about June 26, 2019, three University
employees received letters in the mail, which identified Victim-
1 as the sender. All of the letters contained white powder, and
all of the letters contained what appeared to be a photocopy of
the same hand-written note stating "Im not moving out of my
apartment. Over my dead body."

f.      On or about July 15 and 16, 2019, one University
Employee received a letter and the Manhattan D.A.'s Office
received two letters in the mail which identified Victim-1 as
the sender, either by name or home address. All three letters
contained white powder. The letter to the University employee
contained what appeared to be a photocopy of a hand-written note
stating, "Im not moving out of my apartment. Over my dead body."
The letters to the Manhattan D.A.'s Office did not contain any
notes.

g.      On or about July 15, 2019, Victim-1, one
University employee, and two Management Company employees
received letters in the mail which identified a particular
medical company in New York City (the "Medical Company") as the
sender. None of the four letters contained white powder, and
all four letters contained a typed note stating, "I know you
like good surprises I have a GOOD SURPRISE for you!!! SURPRISE,
SURPRISE, SURPRISE." This message, like the message in the
April 2015 Letter, referenced "surprises." *See supra* ¶ 7(d)(v).

h.      Based on my review of each of the Letters, I have
learned, among other things, that all of the Letters were sent
in similarly sized white envelopes with handwritten addresses.

10.     Based on my involvement in this investigation and my
conversation with other law enforcement officers, I have
learned, among other things, that for each of the 13 Letters
that contained white powder, a recipient dialed 911. The law
enforcement response included, among other things, agents and
officers from of the local NYPD precinct, the JTTF, the FBI
Hazardous Evidence Response Team, the FBI Weapons of Mass
Destruction Team, the U.S. Postal Inspection Service, and the
FDNY.

## The Source of the Letters

11. Based on my review of law enforcement databases and my conversations with other law enforcement officers, I have learned, among other things, the following:

a. On or about July 10 and 11, 2019, someone using a particular phone number identified as belonging to VICTOR DELGADO, the defendant, (the "Delgado Number"), *see infra* ¶¶ 12(a) & 13, checked the tracking information for a particular package (the "July Package").

b. On or about July 8, 2019, the July Package was shipped from Las Vegas, Nevada to the Intermediary at a particular address in midtown Manhattan (the "Midtown Address").

c. The July Package arrived at the Midtown Address on or about July 11, 2019, at approximately 1:30 p.m.

12. On or about July 17, 2019, other law enforcement officers and I interviewed the Intermediary at the Midtown Address. Based on my conversation with the Intermediary, I have learned, among other things, the following:

a. On or about July 8, 2019, VICTOR DELGADO, the defendant, using the Delgado Number, called the Intermediary and told the Intermediary that DELGADO had sent the Intermediary a package containing letters (the "July Letters") DELGADO needed the Intermediary to mail from New York. DELGADO told the Intermediary that the July Letters were pre-addressed and pre-stamped. The Intermediary agreed to mail the July Letters when they arrived.

b. The Intermediary received the July Package on or about July 11, 2019. Upon receiving the July Package, the Intermediary removed five or six letters from inside the July Package and handed them back to the United State Postal Service ("USPS") employee who had delivered the July Package.

c. The Intermediary did not review the addressees on the July Letters or know what was in the July Letters.

d. The Intermediary called DELGADO at the Delgado Number on or about July 11, 2019 at approximately 1:45 p.m. to

8

inform DELGADO that the Intermediary had mailed the July Letters.

13. Based on my review of law enforcement databases, I know that VICTOR DELGADO, the defendant, has used the Delgado Number in the past. For example:

a. In or about January 2018, the Delgado Number called 911 to report an open manhole cover. The caller identified himself as "Delgado."

b. In or about September 2018, the Delgado Number called the University to report a leak in a particular apartment at the Apartment Building. The security guard who answered the call from the Delgado Number knew DELGADO and believed the caller's voice was similar to DELGADO's.

14. Based on my conversations with another law enforcement officer who has reviewed the July Letters as well as USPS data, I have learned, among other things, the following:

a. The July Letters contain barcodes on the envelopes applied by the processing center through which the July Letters were routed.

b. All of the July Letters were processed through the same USPS mail processing facility in Manhattan (the "Manhattan USPS Facility"). The Manhattan USPS Facility processes mail sent from Manhattan in addition to the Bronx, Brooklyn, Queens, and Staten Island.

c. All of the July Letters were processed at the Manhattan USPS Facility on July 11, 2019 between 8:30 and 10:00 p.m. This is consistent with the expected processing time for a letter sent from midtown Manhattan the afternoon of July 11, 2019.

d. Based on the foregoing, I believe that the six threatening letters referenced above in paragraphs 9(f)-(g) are the July Letters, which the Intermediary mailed on behalf of VICTOR DELGADO, the defendant.

15. Based on my conversations with Victim-1 and other law enforcement officers who have met with Victim-1, I have learned, among other things, that Victim-1 denies having sent the

Letters, and has experienced substantial emotional distress as a result of both receiving and being identified as the sender of some of the Letters.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of VICTOR DELGADO, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
JOHN KENNY
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this
5th day of August, 2019

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK